IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

FERDINAND CRUZ-MENDEZ, *et al.*,

    **Plaintiffs,**

        **v.**

UNITED STATES OF AMERICA,

    **Defendant.**

**CIVIL NO.** 10-1753 (FAB)

**OPINION AND ORDER FOLLOWING BENCH TRIAL**

BESOSA, District Judge.

**I.    Background**

On August 4, 2010, plaintiffs Ferdinand Cruz-Mendez ("Cruz") and his wife, Cruz Maria Cruz-Lopez ("Maria"), (collectively, "plaintiffs") filed a complaint against defendant United States of America[1] pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671 *et seq.*, and the Emergency Medical Treatment and Labor Act ("EMTALA"), 42 U.S.C. § 1395dd.  (Docket No. 1.) Plaintiffs allege  that Dr. Anibal Toledo-Velez ("Dr. Toledo") and Castañer General Hospital ("Castañer Hospital") committed medical malpractice and violated EMTALA.  Id.  On July 29, 2011, the Court dismissed plaintiffs' cause of action pursuant to EMTALA.  (Docket No. 22.)  From March 12 to 14, 2012, the Court held a bench trial where all parties presented evidence and arguments.  (Docket

---

[1] Plaintiffs allege that the United States of America is "the proper named defendant" because the entity and the person who violated the FTCA and EMTALA are covered under the Federally Supported Health Centers Assistance Act, 42 U.S.C. § 233.

Nos. 49-51.)   Plaintiffs' witnesses testified in the following order:   Dr. Edwin Miranda-Aponte, Dr. Nadja Torres-Gomez, Dr. Edgardo Ortiz-Matos, Dr. Jose Rodriguez-Ramos, Dr. Ferdinand Cruz-Mendez, and Luz Maria Cruz-Lopez.   Defendant's witnesses testified in the following order:   Nurse Luz Garcia-Santiago, Dr. Anibal Toledo-Velez, and Dr. Emilio Arce-Lopez.   During the trial, defendant also moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50.   (Docket No. 50 at pp. 113-24.) The Court denied the motion.   Id. at p. 124.

On April 16, 2012, the plaintiffs and the United States filed post-trial briefs detailing their proposed conclusions of law and findings of fact.   (Docket Nos. 47 and 48.)   Having reviewed the parties' proposed findings of fact and conclusions of law, (Docket Nos. 47 and 48), the Court now issues its findings of fact and conclusions of law.

## II. FINDINGS OF FACT

### a. The Accident

Plaintiff Cruz is sixty-six years old and lives in Adjuntas. (Docket No. 50 at p. 28.)   Prior to 2008, he made his living as a farmer and by using an agricultural machine to help other farmers build roads on their farms.   Id. at p. 29.   On Saturday, December 22, 2007, at around 10:00 or 10:15 a.m., he was operating a machine called a "D4 Caterpillar," which is used to clear pathways on farms.   Id. at p. 31.   While operating the

machine, he hit a tree or another similar object at the edge of a
path, and a bee hive fell on him.  Id. at p. 34.  The bees stung
him almost everywhere on his body - on his arms, chest, head, face,
and ears - and he felt "a lot of stinging pain."  Id. at pp. 34-35.
He also said that he was stung in the eye area.  Id. at p. 37.  He
recalled that he ran and hid near some bushes or shrubs; after
thirty to thirty-five seconds, the bees left.  Id. at p. 35.

        After the bees left, Cruz went to his vehicle.  Id. at
p. 36.  He felt pain and stinging all over his body, and he felt
dizzy.  Id. at pp. 36, 38, & 91.  He also recalled that he felt
pain in his eye and that "something . . . had bit [sic] [him] in
[his] eye."  Id. at p. 38.  He went home, which took him about five
or six minutes, and called out for his wife.  Id.  She helped him
remove some of the stingers and called his daughter, Marisol Cruz
("Marisol"), for help.  Id. at pp. 39 & 91.  Marisol gave him some
Benadryl pills for the itching and the pain.  Id. at p. 40.  He
knew that the pill would alleviate the allergy from the stings
because he had been bitten by bees three or four times before.  Id.

    **b.   Cruz's Visit to the Castañer Hospital Emergency Room**

        At around 10:20 a.m. on that same date, Marisol took Cruz
to Castañer Hospital's emergency room, which was about three
minutes from his home.  Id. at pp. 40-41.  After he arrived at
Castañer Hospital, Luz Nelida Garcia-Santiago ("nurse" or
"Garcia"), a triage nurse, attended to him.  Garcia was trained as

an associate nurse, which means that she has a two-year degree in nursing, and has been a nurse at Castañer Hospital for about nine years. Id. at p. 99. Her duties include taking care of patients, executing medical orders, and filling out patient records if no personnel are at the receiving window. Id. Garcia did not remember Cruz-Mendez as a patient, but reviewed the record that she filled in for him. Id. at p. 100. She indicated that there was no one at the receiving window that day so she also filled out all of his answers to the preliminary questions on his hospital record. Id. at pp. 103. Cruz also recalled that Garcia took his blood pressure and filled in his record. Id. at p. 41. After reviewing the hospital record, Garcia said that Cruz arrived with bee stings. (Docket No. 50 at p. 102; Joint Exh. I.) She said that at first, Cruz said they were wasps, which she wrote on the hospital record but she crossed that out because he changed his mind and said that they were bees. Id. Cruz also told the nurse that he had been stung throughout his body by the bees. (Docket No. 50 at p. 103.)

       Garcia then performed the triage, which including taking Cruz's vital signs. Id. She asked him if he was allergic to any medication and he responded no, so she indicated that on the record. Id. The nurse also marked Cruz's case as a "traumatic emergency," which means that there has been a lesion, bruise, or trauma on the body. Id. at p. 112. In her testimony, she stated that when someone is stung by bees, the first priority is to make

sure that there is no allergic reaction, which is the reason that the nurses mark it as an emergency.  Id.  Cruz said that he was in pain from the waist up when he arrived at the hospital.  (Docket No. 49 at pp. 41-42.)  Garcia sent him to the waiting room until the physician called him into the office to perform a medical assessment.  (Docket No. 50 at p. 104.)

At around 10:25 a.m., one of Castañer Hospital's emergency doctors, Dr. Toledo, met with Cruz.  (Docket No. 50 at p. 104; Docket No. 51 at p. 6.)  Dr. Toledo has a medical degree from Valencia, Spain, and is only licensed to practice in Puerto Rico.  (Docket No. 51 at p. 6.)  Since about 1977 or 1979, he has worked continuously in emergency rooms.  Id. at p. 7.  He has been working at Castañer Hospital for about twelve years.  Id. at 7.  Castañer Hospital is located in a rural area, but Dr. Toledo stated that bee stings are rare in that area.  Id. at p. 7.

Dr. Toledo interviewed and evaluated Cruz.  (Docket No. 50 at p. 106; Docket No. 51 at p. 8.)  The nurse was not present for the interview.  (Docket No. 50 at p. 104.)  Cruz told him that a bee hive fell on him and he was bitten by bees all over his body.  (Docket No. 50 at p. 42; Docket No. 51 at p. 8.)  Cruz's hospital record reflected that "moments before arriving, [Cruz] was stung by several bees.  Most of all, right eye."  (Docket No. 50 at p. 106-08; Joint Exhibit 1.)  Nurse Garcia identified the handwriting in the hospital record as belonging to Dr. Toledo.  Id.

Cruz also said that he told Dr. Toledo that he was stung inside his
right eye but the hospital records do not indicate that Cruz
complained of being stung inside his right eye or of any vision
problems. (Docket No. 49 at p. 34; Docket No. 50 at p. 42; Docket
No. 51 at p. 10; Joint Exh. 1.)  The medical record also does not
contain evidence of discovery of a foreign body inside Cruz's eye.
(Docket No. 49 at p. 36; Joint Exh. 1.)  Cruz did not mention to
any hospital personnel that he felt dizzy or nauseous.  (Docket
No. 50 at p. 79.)  He told Dr. Toledo that he was healthy and that
he was not allergic to any medication.  (Docket No. 51 at p. 9.)
Cruz also told Dr. Toledo that his family doctor was Dr. Jose
Rodriguez.  Id.

        Dr. Toledo examined Cruz's eye with his pen light.
(Docket No. 51 at p. 9.)  Cruz's eye area was inflamed and red but
he could still see through his eye.  (Docket No. 50 at p. 44.)  He
also wrote down that there was "slight hyperemia in the
conjunctiva."  Hyperemia means reddening, and the conjunctiva is
the film that covers the ocular globe.  Id. at p. 24.  In other
words, the white part of Cruz's eye had a little bit of reddening.
(Docket No. 51 at pp. 9, & 23-24.)  Aside from the reddening, he
could not see anything inside the eye.  Id. at p. 9.  Dr. Toledo
also did not see anything on the eyelids or around the eye.  Id. at
p. 24.  Dr. Toledo indicated that Cruz said he had pain in the "eye
area," which includes the eyelids and the eye orbit, but did not

recall Cruz mentioning that he felt something inside his eye or
that he had pain inside his eye.  <u>Id.</u> at pp. 10-11, 16, & 21.

        Dr. Toledo stated that he examined Cruz's eye using a
light of an otoscope but he did not check Cruz's vision or visual
acuity because Cruz did not complain of any loss of vision.  <u>Id.</u> at
p. 13.    An otoscope is like an ophthalmoscope but the
ophthalmoscope has magnifying power, which might have helped
Dr. Toledo see something inside the eye.  <u>Id.</u> at pp. 13 & 18.
Dr. Toledo also did not use a flourescein stain because he did not
see anything in the eye and did not consider it necessary.  <u>Id.</u> at
pp. 13, 16.  Assuming that there was something in the eye that
Dr. Toledo did not see, he said that the ophthalmoscope with a
fluorescein stain would have helped him determine if there was a
perforation or abrasion of the cornea.  <u>Id.</u> at p. 19.

        Cruz maintains that Dr. Toledo said there was something
inside Cruz's eye but that he was not going to remove it.  (Docket
No. 50 at pp. 43, 71, 84, & 115.)  According to Cruz, he did not
ask Dr. Toledo why he would not remove it because he said
Dr. Toledo "told [him] in bad taste," as if he did not believe Cruz
that he was stung in his eye.  <u>Id.</u> at p. 84.  Dr. Toledo indicated
that the greatest concern with bee stings is an allergic reaction.
<u>Id.</u>  Finally, Dr. Toledo gave him an antihistamine, Benadryl; an
anti-flammatory, Solumedrol; and for pain, acetaminophen, Tylenol
(Docket No. 51 at p. 11.)  He administered the anti-histamine and

the anti-inflammatory intravenously before leaving Cruz. <u>Id.</u>
Dr. Toledo did not see Cruz again until he discharged him, which
was about an hour later. <u>Id.</u>

After Cruz finished the evaluation with Dr. Toledo, he
handed the nurse the medical record and she proceeded to execute
the medical orders. (Docket No. 50 at p. 104.) The medical orders
instructed the nurse to administer Benadryl 25 and Solumedrol 125.
<u>Id.</u> at pp. 104-05. The orders also included a prescription for one
gram of acetaminophen tablets orally. <u>Id.</u> at 105. The nurse
informed Cruz that she needed to give him intravenous medication.
<u>Id.</u> She then laid out all of the medications listed in the orders
and informed Cruz of each of the medications before she
administered them. <u>Id.</u> She said that Cruz had no complaints and
she continued working with her other patients. <u>Id.</u>

Cruz said that about half an hour to forty-five minutes
later, the nurse came back with Dr. Toledo, who allegedly asked if
Cruz's eye was still hurting a lot. <u>Id.</u> at p. 45. Cruz answered
yes so Dr. Toledo allegedly administered some eye drops and said
that the pain would go away in a little while. <u>Id.</u> Dr. Toledo
also allegedly gave Cruz some pills, which Cruz said were for his
pain. <u>Id.</u> Cruz did not know what they were but he said that they
were not antibiotics. <u>Id.</u> Cruz said that Dr. Toledo told him to
see his primary physician on the next working day. <u>Id.</u> at p. 46.
Cruz did not ask Dr. Toledo to refer him to an ophthalmologist.

(Docket No. 51 at p. 84.)  Dr. Toledo also did not consult the ophthalmologist who provides services at Castañer Hospital once a month in the emergency room.  Id. at p. 22.  Dr. Toledo said this is because the emergency room never consults that ophthalmologist. Id.

At approximately 11:20 a.m., Cruz was discharged from Castañer.  (Docket No. 50 at p. 106.)  Dr. Toledo filled out the discharge summary and wrote on it what medication was required and prescribed Cruz medication that was similar to the type of medication that he administered to him earlier.  (Docket No. 50 at p. 106-07; Docket No. 51 at p. 12.)  Specifically, Dr. Cruz prescribed Benadryl, acetaminophen, and another steroid, Prednisone, which is similar to Solumedrol, but taken orally. (Docket No. 51 at p. 12.)  Cruz was to take the Benadryl every six hours; the Prednisone every six hours; and the acetaminophen every four hours, if necessary, for pain.  Id.  The discharge summary also states that if Cruz did not improve or if his condition worsened, he should return to the emergency room or to visit his primary doctor during the next working day to be reevaluated. (Docket No. 50 at p. 107; Docket No. 51 at p. 23.)  Dr. Toledo also writes down any complaints in the chart.  (Docket No. 51 at p. 15.) There is a white page and a yellow page, and the yellow page is given to the patient.  (Docket No. 50 at p. 107.)  Cruz did not return to Castañer Hospital after this visit.  Id. at p. 82.

Dr. Toledo indicated that if he finds a lesion inside a patient's eye, he would apply an antibiotic cream and put a patch over the eye.  (Docket No. 51 at p. 16, 19, & 20.)  He did not do this for Cruz because he did not see anything inside Cruz's eye. Id. at p. 16.  Dr. Toledo indicated that if somebody has an injury inside the eye, there are several things that he could do depending on the seriousness of the lesion.   Id. at p. 15.   If the seriousness is minimal, like in Cruz's case, and he saw the patient during working hours, then he can consult an ophthalmologist's office and send him to the ophthalmologist if the patient accepts it.  Id.  Also, he could have tried to transfer him or have him go see an ophthalmologist as soon as possible.  Id. at p. 20.

### c.   The Two Days After Crus was Discharged

Cruz returned to his home after he was discharged. (Docket No. 50 at p. 47.)  He laid down to rest but did not sleep much because of the pain.  Id. at pp. 48 & 92.  He told his wife to cover the windows because the light was bothering him.  Id. at p. 92.  On the following day, Sunday, he still had pain in his face and his eye, and he rested until about 4:00 p.m., when his other daughter, Luz Fermina Cruz-Cruz, arrived.  Id. at p. 48.  She told him that his eye was turning blue.  Id.  On that day, Cruz could not see very well but he could still see quite a bit.  Id. at p. 52.  The tearing, he said, bothered him a lot.  Id.  He did not consider going to the Puerto Rico Medical Center because he could

barely stand and felt a lot of pain.  Id. at 81.  He preferred to wait until the next day.  Id.  His wife, Maria, confirmed that they did not return to Castañer Hospital either.  Id. at 93.  They believed that if he had gone back to the hospital, he would see the same doctor.  Id. at 93-94.  She believed that the doctor would have just told them to go see his primary physician.  Id. at 94. Furthermore, Cruz did not think that the eye was so bad and or that he had an infection.  Id. at 81.

On the following day, Monday morning, Cruz allegedly called his primary physician and good friend, Dr. Jose Rodriguez ("Dr. Rodriguez").  Id. at 81-82 & 94.  Dr. Rodriguez and Cruz had met about twenty-two years before, when Dr. Rodriguez first arrived at Castañer.  Id. at p. 6.  Dr. Rodriguez graduated from the University of Puerto Rico in 1987 and was board certified as a family physician until 2011.  (Docket No. 49 at p. 153.) Currently, he is Castañer Hospital's medical director, a position that he has had since 2005.  Id. at p. 154.  Dr. Rodriguez oversees the emergency room schedule; he also oversees the clinic at Castañer Hospital and the satellite clinic in Adjuntas.  (Docket No. 50 at p. 5.)  He represents the board of directors for the clinic evaluation.  Id.  He sees most of his patients in the clinics but he also sees patients in the emergency room at most once or twice a month when he covers shifts.  Id. at p. 5-6.

Dr. Rodriguez was not working in the emergency room that day - he was on call as the medical director. Id. at p. 7. Cruz alleges that he told Dr. Rodriguez about his bee stings and that he could no longer see through his eye. Id. at p. 50. Cruz also alleges that Dr. Rodriguez responded by telling him to go to see an ophthalmologist or to the Puerto Rico Medical Center but that because it was Christmas Eve, it may not have been possible to see an ophthalmologist. Id. Dr. Rodriguez does not recall, however, whether or not Cruz and his wife called him on December 22, 2007. Id. at p. 9.

Cruz then went with his son-in-law to see if they could find an ophthalmologist whose office was open in the Arecibo area. (Docket No. 50 at p. 50.) They could not find an ophtalmologist with an open office because it was during Christmas Eve day; they then decided to go to the Medical Center. Id. at 50-51. While they were on the way to the Medical Center, however, Cruz received a phone call from his son, who is a priest in Villalba, who had found an ophthalmologist in Ponce who was willing to see him in the afternoon. Id. at p. 51. Rather than continuing to the Medical Center, he went to see that ophthalmologist, Dr. Edgardo Ortiz ("Dr. Ortiz"). Id. at 52.

**d.    Initial Visits and Surgery with Dr. Edgardo Ortiz in 2007 and 2008**

Dr. Ortiz is an ophthalmologist licensed to practice in Puerto Rico and Louisiana. (Docket No. 49 at p. 80.) He has a

subspecialty in retinal diseases and surgery of the retina.  Id. at
pp. 45, 50, & 80.  He is board certified in ophthalmology and is a
fellow of the American Academy of Ophthalmology and of the American
College of Surgeons.  Id. at 80.  He has been in practice since
1984 and has an office at the School of Medicine in Ponce.  On
Monday, December 24, 2007, Dr. Ortiz's office was closed but he
opened it to attend to Cruz because a personal connection referred
Cruz to him.  Id. at pp. 82-83.  He saw Cruz at about 3:00 p.m. or
4:00 p.m. for the first time on that day.  Id. at p. 84.

### 1. December 24, 2007

On December 24, 2007, according to Dr. Ortiz's
notes, Cruz told Dr. Ortiz that he had been in some kind of
orchard, where he disturbed some bees that chased him and stung
him.  Id. at p. 84.  Dr. Ortiz found that Cruz had a penetrating
injury to the cornea of his right eye.  Id. at p. 83.  Dr. Ortiz
assumed that Cruz was injured in the eye while he was running from
the bees.  Id. at p. 84.  That type of injury could have had
immediate damage to the cornea.  Id. at p. 130.  Dr. Ortiz does not
recall whether Cruz said that the emergency room physician told him
"You have something in your eye but I'm not going to take it out."
Id. at p. 138.

Dr. Ortiz performed a visual acuity test.  Id. at
pp. 50 & 85.  Cruz did not have glasses at that time.  Id. at
p. 85.  Cruz's eye was inflamed and Dr. Ortiz examined his eye with

a microscope in his office.  Id. at p. 84.  Dr. Ortiz found that he had 20/20 vision without glasses in his left eye.  Id. at p. 86. Cruz had exceedingly poor vision in his right eye, however, and could only count fingers at about three feet distance.  Id. at pp. 83-84 & 86.

Dr. Ortiz also stained Cruz's eye with flourescein, which is a dye used to denote where there are defects in tissues. Id. at p. 86.  Dr. Ortiz said that the stain signifies whether an ulcer exists and, if so, the ulcer's size.  Id.  He presumed that Cruz had a corneal ulcer, which is a defect in the cornea that is produced mainly by infectious organisms, bacteria, fungi, or viral matter.  Id. at pp. 86-87.  A corneal ulcer is a crater or a hole in the superficial tissue of the cornea and is usually painful. Id. at p. 30.  Most corneal ulcers involve an infection.  Id. at p. 85.

Dr. Ortiz also found that there was a small level of pus inside the anterior chamber of the eye, which is the area that includes anything from right behind the cornea and up to the iris. Id. at pp. 84, 87, & 89.  The pus, which spread over his eye, indicated a severe infection.  (Docket No. 49 at p. 85; Docket No. 50 at p. 53.)  The eye was red and there was a large inflammatory reaction inside the eye.  (Docket No. 49 at p. 85.) Normally, a cornea is crystal clear to allow light rays to to through it in order to be focused on the back of the eye.  Id. at

pp. 84-85.  Because of the injury, however, Cruz's cornea had
turned edematous, meaning that it was white in the center and
swollen.  Id. at pp. 84-85.  Based on these observations, Dr. Ortiz
told Cruz that he had a severe eye infection that needed treatment
as soon as possible and he gave Cruz topical antibiotics
immediately.  Id. at pp. 84, 85, & 90.  Dr. Ortiz prescribed Cruz
Ciloxan drops and Ciloxan ointment, and told him to fill the
prescription immediately because the ulcer was rapidly worsening.
(Docket No. 49 at p. 90; Docket No. 50 at p. 54.)  He told Cruz to
start the drops every half hour when he was awake and to apply the
ointment at night.  (Docket No. 49 at pp. 90-91.)  He did not,
however, give Cruz any systemic medications.  Id. at p. 90.
Dr. Ortiz also told Cruz to come see him again forty-eight hours
later.  Id. at 91.

### 2.   December 26, 2007

Dr. Ortiz saw Cruz forty-eight hours later on
December 26, 2007.  Id.  Dr. Ortiz was afraid that the infection
could lead to perforation.  Id.  Cruz said that he was feeling
better; his vision in his right eye was still poor, however,
because he could only count fingers at about two feet.  Id.
Dr. Ortiz examined Cruz with a slit lamp on this date.  Id. at
p. 95.  Dr. Ortiz believed that Cruz had responded to the
antibiotics quickly.  Id. at p. 148.  During this visit, Dr. Ortiz
found that the flourescein stain was gone, the cornea had healed a

bit, and the pus had cleared out of the eye completely.  Id. at
pp. 91, 93, & 149.  Dr. Ortiz believed that Cruz was probably
noninfectious at this point.  Id. at pp. 91 & 93.

On that date, Dr. Ortiz diagnosed Cruz again with
acute keratitis, which is an infection of the cornea with a severe
inflammatory reaction.  Id. at p. 93.  Dr. Ortiz reduced Cruz's
Ciloxan eye drops to every hour and added another antibiotic,
Tobramycin, which Cruz also had to take every hour.  Id. at p. 94.
Dr. Ortiz indicated that there was no scientific reason for adding
another antibiotic but he wanted to "knock [the infection] out."
Id. at p. 94.

### 3.   December 28, 2007

Dr. Ortiz saw Cruz again, forty-eight hours later,
on December 28, 2007.  Id.  Dr. Ortiz examined Cruz with a slit
lamp on this day as well.  Id. at p. 9.  Dr. Ortiz found that the
cornea was inflamed but without a stain.  Id.  Cruz's vision,
however, was worse than in the past:  Cruz only had "hand motion
vision," which means that he could see hand movements at about two
or three feet but he could not count the number of fingers on the
hand.  Id.  Cruz also recalled Dr. Ortiz saying that the infection
was going away and that the eye had improved quite a bit.  (Docket
No. 50 at p. 55.)  With some of the liquid clearing inside the
cornea, Dr. Ortiz could see a foreign body deep inside the cornea
even though he could not tell exactly what it was.  (Docket No. 49

Civil No. 10-1753 (FAB)                                                17

at p. 96; Docket No. 50 at p. 56.)  It was an elongated brown-white particle and only some of it was visible.  (Docket No. 49 at p. 97.)  He presumed that it could be a thorn, splinter, or a bee stinger.  Id. at p. 96.

Dr. Ortiz did not attempt to remove the object because he wanted to wait to see if he could try to remove it later in the office with a slit lamp.  Id. at 97.  He could not tell whether the object had penetrated through into the anterior chamber; if it had, if would have been problematic for him to remove it.  Id. at pp. 97-98.  Ultimately, Dr. Ortiz did not decide to remove it because the object had penetrated all the way through into the anterior chamber.  Id. at p. 97.

Dr. Ortiz also indicated that he would not have been able to see the foreign object on the first day that Cruz came to see him because the cornea was so edematous that it was white and almost completely opaque.  Id. at p. 98.  Dr. Ortiz continued giving Cruz antibiotic drops but reduced the administration of the drops.  Id. at p. 99.  He told Cruz to continue the drops because he was not sure if he had cured the ulcer completely.  Id.  Cruz also recalled Dr. Ortiz telling him that until he could cure the infection in Cruz's eye, Dr. Ortiz would not be able to remove the foreign body.  (Docket No. 50 at p. 57.)

### 4.   December 31, 2007

Dr. Ortiz saw Cruz again on December 31, 2007. (Docket No. 49 at p. 99.)  His vision in his right eye was similar to that during his last visit:  he could not count fingers but could see hand movements at about two feet.  Id. at p. 100.  The cornea was white and opaque, especially in the center, and the anterior chamber appeared not to be inflamed.  Id.  The eye, however, was red.  Id.  Cruz was "feeling pretty good" even though he could not see anything out of his right eye.  Id.  Dr. Ortiz's diagnosis of Cruz's eye was still keratitis.  Id.  Dr. Ortiz dilated Cruz's pupil but all he could see was a retinal red reflex, which is similar to what happens when someone takes a photograph of many people and everyone's pupil lights up.  Id. at pp. 100-01.  He could not see the retina itself because of the opaqueness of the cornea.  Id. at p. 101.

On that date, Dr. Ortiz also diagnosed Cruz with "microcystic edema" on his cornea, which means that the cornea contained multiple cloudy dots but without a large stain, like an ulcer.  Id. at p. 102.  Dr. Ortiz continued the treatment of alternating antibiotic eye drops during the day and ointment at night time.  Id. at p. 103.  This was the first appointment where Dr. Ortiz noted that he was thinking about removing the foreign body from Cruz's eye because the opaqueness of Cruz's cornea was getting better even though Cruz's vision was still poor.  Id.

Dr. Ortiz did not consider leaving the object in because it could have been organic material that was causing the violent inflammatory reactions inside the eye.  Id.  When organic material enters into the cornea, damage to the cornea happens very quickly, Id. at p. 134, because organic material typically contains bacteria and when the bacteria gets into the eye, it can multiply quickly and produce toxins.  Id. at p. 148.

### 5.   January 3, 2008

Dr. Ortiz saw Cruz again seventy-two hours later on January 3, 2008.  Id. at p. 104.  Dr. Ortiz believed that the cornea had superficially healed because the infection had cleared out by this date.  Dr. Ortiz noted, however, that it was still an opaque cornea weakened by inflammation, which was still present, and that Cruz still only had hand-motion vision at two or three feet.  Id.  On this date, Dr. Ortiz was able to obtain a normal pressure reading in the right eye.  Id. at pp. 104-05.  Dr. Ortiz decreased the intervals of alternating antibiotic drops and continued the ointment application at night.  Id. at p. 105.

### 6.   January 9, 2008

The next time that Dr. Ortiz saw Cruz was on January 9, 2008.  On this date, the nurse performed the vision acuity exam.  Id. at p. 105.  She wrote down that Cruz could count

fingers at two feet,[2] that Cruz was feeling better, and that the "corneal foreign body could be seen within the stroma."  Id. at p. 105.  Dr. Ortiz decided to see if he could remove the foreign body.  Id. at p. 105-06.  He originally wanted to remove the object under local anesthesia in his office but changed his mind and scheduled the removal for a few days or one week later, and ordered the medical clearance necessary to admit Cruz for surgery.  Id. at p. 106 & 131.  Dr. Ortiz instructed Cruz to continue with the alternating antibiotic drops plus the ointment.  Id. at p. 106.

        **7.   January 22, 2008**

        Dr. Ortiz next saw Cruz on January 22, 2008, one day before Dr. Ortiz was to remove the foreign object from Cruz's eye.  Id. at p. 107.  Dr. Ortiz agreed that Cruz probably should have seen him earlier than this date and that the wait between January 9, 2008 and January 22, 2008 was too long of an interval to wait.  Id. at pp. 140 & 150.  This long interim could have made a difference in Cruz's treatment, but Dr. Ortiz stated that in any event a corneal transplant was probably necessary for a satisfactory result, and it might not have made a difference if Cruz came in earlier to see Dr. Ortiz.  Id.  Cruz was "feeling pretty good" and could count fingers at four feet.  Id. at p. 107.  Although Cruz's cornea was opaque, it was clear enough to allow

_____

        [2] It appears that either Dr. Ortiz or his nurse performed another visual acuity test because he later indicates that on this date, Cruz could count fingers at four feet.  Id. at p. 106.

Dr. Ortiz to see the foreign body.  Id.  Dr. Ortiz kept Cruz on the eye drops until the next morning, which was when he was scheduled for surgery at the hospital.  Id.

**8.  January 23, 2008**

On January 23, 2008, at San Lucas Hospital, Dr. Ortiz performed surgery on Cruz under general anesthesia. (Docket No. 49 at pp. 108 & 110; Docket No. 50 at p. 56.) Dr. Ortiz used a powerful microscope to assist him in removing the foreign body from Cruz's eye.  (Docket No. 49 at p. 130.)  A general practitioner could not have performed the surgery; only an ophthalmologist who had additional training to do the procedure could have performed that surgery with a microscope.  Id. at pp. 131 & 133.  The surgery took about twenty-five minutes.  Id. at p. 146.  During surgery, Dr. Ortiz noticed that the object had "gone through" Cruz's eye and into the anterior chamber.  Id. at p. 108.  Dr. Ortiz believed that the foreign object was a thorn or splinter but he could not tell by looking at it.  Id. at p. 111. He had never seen or read any medical literature about a bee sting inside the eye - he has seen bee stings almost always on the lids, cheeks, or other areas around the eye.  Id. at pp. 142 & 151.

Dr. Ortiz sent a section of the foreign body that he removed to pathology, which indicated that it measured 0.2

centimeters by 0.2 centimeters by 2 centimeters.[3]  Id. at p. 111.
Although the foreign body was not microscopic, it was very small
and it was the deepest that Dr. Cruz had ever seen an object go
through an eye.  Id. at p. 129.  A CT scan could have missed the
foreign object, depending on how deep the image cuts of the eye
were.  Id. at pp. 135-36 & 139.  The rest of the object was
"sitting in the anterior chamber."  Id. at p. 109.  Even if
Dr. Ortiz or someone else had seen the foreign body inside the eye
on the very same day that it entered the eye, a scheduled surgery
would have been required to remove it because it was already in the
anterior chamber.  Id. at p. 133.  If an ophthalmologist had
discovered the foreign body in the eye on the first day, there
might have been a chance of removing it before the opacification
occurred in the eye but the surgery could not have been performed
with a slit lamp in the office because that would have "knocked
[the foreign body] into the inside of the eye."  Id. at p. 134.

        After the surgery, Dr. Ortiz recorded that Cruz
could count fingers at one foot and that Cruz's eye had about
normal pressure; the anterior chamber was deep but not inflamed,
and the cornea was still cloudy.  Id. at p. 110.  Dr. Ortiz
prescribed Cruz new antibiotics and a steroid.  Id.  Cruz also

-------------------

[3]  The Court believes that Dr. Ortiz misspoke and instead,
intended to say "0.2 centimeters" given his discussion about how
small the object was and how he could not see it because it was so
small.

recalled that he could see a blot through the eye but nothing else.
(Docket No. 50 at p. 58.)  Cruz said that he could not see anything
since the day of the accident and that up until the time of this
first surgery, he would feel pain if he received too much light or
sunlight.  Id.  Even after the surgery, he stated that he would
feel pain if he was exposed to too much light.  Id.

### 9.    Post-Surgery Appointments

Dr. Ortiz saw Cruz in his office the day after the
surgery, on January 24, 2008.  (Docket No. 49 at p. 112.)  Cruz's
cornea still looked terrible but the eye was not inflamed.  Id.
There was some mild "intraocular inflammation" probably produced by
the surgery.  Id.  On that day, Cruz's vision was still counting
fingers at one foot.  Id. at p. 113.  Dr. Ortiz prescribed a
steroid and an antibiotic.  Id.

Dr. Ortiz next saw Cruz on the eighth day after the
operation, January 31, 2008.  Id.  Cruz' vision was better and his
eye pressure was about normal.  Id.  Cruz could finally see "the
big E" during a visual acuity exam.  Id.  Dr. Ortiz reduced the
number of eye drops that Cruz needed to take.  Id.  Dr. Ortiz next
saw Cruz on February 15, 2008.  Id. at p. 114.  The cornea was
about the same and Cruz could count fingers at five feet.  Id. at
p. 115.  Dr. Ortiz's only course of treatment at this point was the
anti-inflammatory medication; he had eliminated the antibiotic.
Id.

### 10.  March 7, 2008 Visit

The next time that Dr. Ortiz saw Cruz was nearly one month later, on March 7, 2008.  Id.  Cruz was counting fingers at four feet and had adequate pressure in his eye.  Id.  Dr. Ortiz examined the retina with "wide pupillary dilation," which means that he widened the pupil so that he could look in the back of the eye.  Id. at pp. 115-16.  He found that the retina was normal and attached.  Id. at p. 116.  He did not write any further description of the retina but wrote a note referring Cruz to Dr. Nadja Torres ("Dr. Torres").  (Docket No. 49 at pp. 45 & 116; Docket No. 50 at p. 59.)  Dr. Torres is an ophthalmologist with a subspecialty in diseases and surgery of the cornea.  (Docket No. 49 at pp. 42-43 & 116; Docket No. 50 at p. 59.)  Dr. Ortiz referred Cruz to her because he believed that only a corneal transplant could rehabilitate Cruz's eye.  (Docket No. 49 at p. 116.)  That procedure cannot be performed by general ophthalmologists.  Id. Dr. Ortiz believed that Dr. Torres has performed corneal transplants frequently enough to be proficient at it.  Id. at p. 117.  In his opinion, Cruz's cornea might be "a little better one day, a little less another day" but Dr. Ortiz believed that the cornea was "irreversibly damaged" and that it was not going to any better without a corneal transplant.  Id.  Dr. Ortiz believed that the procedure would probably take about one hour or one hour and fifteen minutes.  Id. at 146.

### 11.  May 22, 2008 Visit

Dr. Ortiz next saw Cruz on May 22, 2008.  Id. at
p. 118.  He indicated that Cruz "should have had an appointment
[sic] sooner" but that Dr. Ortiz did not see him until then.  Id.
at pp. 118 & 143-44.  On that day, Cruz could see the big E again
and his eye pressure was normal.  Id. at p. 118.  There was,
however, a blister and vacuoles full of liquid on the surface of
the cornea.  Id.  Dr. Ortiz had not received any notes from
Dr. Torres regarding her treatment with Cruz.  Id. at p. 119.
Dr. Ortiz wrote down that he would consult again with her.  Id.
Dr. Ortiz did not see Cruz again until over one year later, on
September 14, 2009.  Id.

### e.  Cruz's First Visit with Dr. Torres on June 23, 2008

Dr. Torres is an ophthalmologist and was licensed to
practice medicine in 1991.  Id. at pp. 42-43.  She graduated from
the University of Puerto Rico School of Medicine in 1990.  Id.
at 43.  She is licensed in Puerto Rico, Texas and North Carolina;
her subspecialty is the "anterior segment" of the eye, which mainly
involves the cornea, glaucoma, and cataract surgery.  Id. at 42-43.

Dr. Torres saw Cruz as a patient for the first time on
June 23, 2008, one month after Cruz's last visit with Dr. Ortiz on
May 22, 2008.  Id. at p. 45.  Cruz brought Dr. Ortiz's note, which
described what Dr. Ortiz had observed during his visits and that
Cruz was interested in a possible cornea transplant.  Id.

Dr. Ortiz did not mention anything about Cruz's retina in his note even though he is a retinologist.  Id. at p. 50.

In her own notes, Dr. Torres described Cruz as a 63-year-old male who complains of decreased vision in his right eye after he was stung by bees.  Id. at p. 47.  Cruz denied that he had any pain; he complained of photophobia (light sensitivity), which is common in cornea trauma, and secretions.  Id. at pp. 47 & 51. During that visit, Dr. Torres performed several exams, including using just her fingers to test Cruz's vision and also using a slit lamp.  Id. at pp. 49-50.

She also made several observations, including that the cornea was edematous (swollen and opaque) and that he had a mature cataract, which means that the crystalline lens has lost its clarity and has become opaque.  (Docket No. 49 at pp. 47-48 & 50; Docket No. 50 at p. 60.)  He also had bullae, which are fluid-filled spaces on the anterior surface of the cornea that occur because of damage to the cornea.  (Docket No. 49 at p. 50.)  The bullae may be painful.  Id.  She also found Descemet folds that occur on the inner part of the cornea.  Id. at p. 51.  Descemet folds occur when the inner cornea, which is normally transparent, becomes wrinkled and folded.  Id.  Finally, she found that he had an atrophic iris, which means that the iris had lost its color, it's thickness, and the ability to move correctly.  Id. at p. 52.

Dr. Torres also performed a dilated pupil eye exam to see if she could see the back of the eye, but could not get any details on the retina.  <u>Id.</u> at p. 48.  She performed a visual acuity test on Cruz and found that he had poor vision in his right eye and good vision in his left eye.  <u>Id.</u> at p. 49.  She could not determine whether or not the cataract caused the bad vision in his right eye.  <u>Id.</u>  She also could not determine whether the injury caused the cataract or whether the cataract occurred before the trauma.  <u>Id.</u> at p. 55.

Dr. Torres spoke to both Cruz and his wife and explained to them that the only way to improve his vision was to perform a corneal transplant and cataract surgery.  (Docket No. 49 at p. 53; Docket No. 50 at p. 63.)  The procedures could be performed at the same time or at different times.  (Docket No. 49 at p. 53.)  She also spoke with them about the benefits and risks of surgery. (Docket No. 49 at p. 53; Docket No. 50 at p. 61.)  Some of the benefits would include having useful vision in the eye and removal of the bullae if the patient has any kind of pain or discomfort. (Docket No. 49 at p. 60.)  Some of the risks include infection; inflammation; glaucoma, which is when the introcular pressure is high and causes damage to the optic nerve; and retinal detachment, when the inner part of the eye - the retina - is detached from its nutrient source.  <u>Id.</u> at pp. 55-56.  Both procedures would have the same risks with the added risk of a corneal graft rejection.  <u>Id.</u>

Civil No. 10-1753 (FAB)                                                    28

at p. 57.   If a patient's cornea rejects the graft, then the
patient might have the same problems as prior to surgery and would
have to undergo a second transplant.  Id. at p. 58.  Some patients
have undergone two or three transplants.  Id. at p. 59.  Both
procedures would have to be done at the hospital under general
anesthesia.  Id. at p. 61.  Dr. Torres tells all of her patients
that she cannot guarantee anything with surgery.  Id.  On that
date, Cruz decided to wait for the surgery.  Id. at p. 53.

### f.   Follow-up Visits with Dr. Ortiz in 2009 and 2010

#### 1.   September 14, 2009

As mentioned earlier, Dr. Ortiz last saw Cruz on
May 22, 2008.  Over one year later, Dr. Ortiz saw Cruz again, on
September 14, 2009.  Id. at 119.  Cruz went back to Dr. Ortiz
because he had a stinging sensation that was causing him pain.
(Docket No. 50 at p. 62.)  The pain was caused by the blister that
Dr. Ortiz saw on May 22, 2008, which had apparently come off.
(Docket No. 49 at p. 120.)  Cruz had not followed up with
Dr. Torres but Dr. Ortiz did not recall why.  Id.  On that day,
Dr. Ortiz prescribed eye drops for pain, eye drops for anti-
inflammation, and a hyper-concentrated salt solution to suck out
the liquid in the eye.  Id. at p. 121.

#### 2.   January 14, 2010

Four months later, on January 14, 2010 Dr. Ortiz saw
Cruz once more.  Id. at p. 122.  Dr. Ortiz indicated that he had

told Cruz to schedule an appointment for two months after September 14, 2009, but Dr. Ortiz did not see Cruz until January 14, 2010. Id. at pp. 122 & 144. Cruz's vision was poor and all he could see were hand movements. Id. at p. 122. The retina, however, was in pretty good condition. Id. Dr. Ortiz had a conversation about Cruz's options with him, and Dr. Ortiz advised Cruz to consider a corneal transplant and/or cataract surgery. Id. at pp. 122-24. Dr. Ortiz never "got a good reason why [Cruz] didn't go through with the transplants." Id. at p. 123. Dr. Ortiz did not believe that Cruz had a cataract when Dr. Ortiz first saw him in 2007 but he was not surprised by the development of the cataract because of Cruz's age and all of the manipulations that occurred in his eye. Id. at p. 122.

On that date, Dr. Ortiz also discussed with Cruz the risks of undergoing the surgeries. Id. at p. 124. The risks included high refractive error, which could lead to astigmatism; and a choroidal expulsion hemorrhage, which is a sudden decompression of the eye during surgery that could cause a bursting artery in the retina. Id. at pp. 124-25. Dr. Ortiz also indicated that these risks do not only occur with a corneal transplant but can occur with any eye surgery. Id. at p. 126. Dr. Ortiz recommended that Cruz go back to see Dr. Torres. (Docket No. 50 at p. 62.)

**g.   Cruz's Second Visit with Dr. Torres on February 10, 2010**

On February 10, 2010, Cruz saw Dr. Torres a second time. (Docket No. 49 at p. 62.)  He had another note from Dr. Ortiz that was dated January 14, 2010.  Id.  The note indicated that Cruz wanted to proceed with a corneal transplant with or without cataract removal.  Id.  Dr. Torres observed that Cruz complained of decreased vision in his right eye.  Id.  She performed a visual acuity test, which showed that he had poor vision and could only see hand movements close to him.  Id. at pp. 62-63.  Dr. Torres indicated that it was possible that with the passage of time, the cornea's condition had become worse, which may have caused Cruz to lose more vision.  Id. at p. 78.  She also performed an exam on the eye and found that his cornea had larger bullae, which meant that the edema was worse.  Id. at p. 63.  He had the same atrophic iris and cataract but the eye and lid looked normal from the outside. Id. at pp. 63-64.

During that visit, Dr. Torres recommended that Cruz undergo the corneal transplant because she believed that he could have recovered vision and that there was no other option for improving his vision.  Id. at pp. 64, 71, & 73.  The success of the corneal transplant depends on the diagnosis and status of the cornea.  Id. at p. 72.  Dr. Torres believed that, given the state of damage to Cruz's cornea, he had a thirty percent chance of maintaining a clear graft throughout the rest of this life.

(Docket No. 49 at p. 72; Docket No. 50 at p. 61.)  Dr. Torres recalled that Cruz agreed to undergo the corneal transplant plus the cataract removal, which is known as a "triple procedure." (Docket No. 49 at pp. 53-54.)

On that date, Dr. Torres gave Cruz a sheet with instructions for everything that he needed to bring prior to surgery.  (Docket No. 49 at p. 76.)  Dr. Torres and Cruz scheduled an appointment for March 18, 2010 for this purpose.  <u>Id.</u>  On March 18, 2010, Dr. Torres would have examined his lab work and performed all the pre-surgery tests, but Cruz did not show up, did not call to cancel, and did not give a reason why he did not show up.  <u>Id.</u> at pp. 73 & 76.  Dr. Torres never saw him again after February 10, 2010.  <u>Id.</u> at p. 73.

In 2010, the corneal tissue would have cost $1,625 and the surgery would have cost $1,000.  <u>Id.</u> at p. 64.  The post-operative kit, which has everything that the patients need to treat their eye after surgery cost $40.  <u>Id.</u> at 65.  Dr. Torres believes that insurance would have covered everything for the cataract surgery, including the intraocular lens; but she does not believe that the insurance would have covered the corneal tissue and corneal surgery.  <u>Id.</u> at pp. 65 & 74.  Cruz, however, recalls that Dr. Torres told him that it would cost $3,600 and that his

insurance plan would not cover the surgery.[4]  (Docket No. 50 at pp. 61-62.)  Dr. Torres said that there would also be an anesthesia cost and the patient would need a complete physical exam, x-rays, EKG, and blood work to get clearance for anesthesia.  (Docket No. 49 at p. 66.)  Dr. Torres guesses that the anesthesia charge would have been about one-third of the cost of surgery itself; in this case, that would have been between $300 to $350.  (Docket No. 49 at p. 66.)  Dr. Torres does not know if the cost of the anesthesia would have been covered by the insurance.  Id. at p. 74.

After the triple procedure, a patient might feel some burning and tearing but if there are no complications, the patient would probably not feel pain.  Id. at p. 75.  There might be an increase in the eye pressure or inflammation after the surgery and some pain might be associated with those occurrences.  Id.  The recovery would take about one week but the visual recovery is slow and can take up to one year.  Id. at p. 67.

### h.   Other Testimony by Cruz

Cruz said that he opted not to undergo the surgery because he does not have money and he was afraid that he would reject the cornea graft. (Docket No. 50 at pp. 62-63.)  He also

---

[4] It is unclear when this conversation about the pricing occurred.   Cruz recalls that he had this conversation with Dr. Torres during his first visit in 2009 with her, (Docket No. 50 at p. 61), and again during his second visit with her in 2010, id. at p. 62.  Dr. Torres, however, makes no mention of when this conversation occurred or if she mentioned it to Cruz more than once.

said that he was afraid of having tissue of someone who has died.
Id. at p. 63.  He alleges that he still has pain today and that the
eye gets inflamed if he gets too much light.  Id.  Every time he
feels irritation, he puts in some antibiotic eye drops that
Dr. Ortiz prescribed.  Id.  He states that he cannot see anything
through his right eye.  Id. at p. 64.

### i.   Dr. Rodriguez's Testimony about How an Eye Trauma Patient Would Be Treated at Castañer Hospital

Dr. Rodriguez, plaintiff Cruz's friend, primary physician
and the director of Castañer Hospital, discussed how a patient with
eye trauma would be examined at the emergency room.  (Docket No. 50
at p. 9.)  He stated that the triage nurse would first perform the
screening by evaluating the patient.  Id.  The nurse would ask
whether the patient is allergic to any medicine, what illnesses the
patient has, and why he or she has come to the emergency room.  Id.
The nurse would determine the patient's degree of severity from one
to three, with one being so severe that the patient's life is at
risk, two being not so severe, and three meaning that the patient
can wait.  Id.  Then, the patient would have a consultation with
the doctor, who would make a history and perform a physical
evaluation.  Id.

Dr. Rodriguez indicated that the hospital has a handbook
guide that suggests to physicians what they can look for in the
event of a trauma.  Id. at p. 10; See Plaintiff's Exh. 1.
Dr. Rodriguez indicated that the emergency room physician, however,

has discretion as to what to do with an ocular emergency because
the handbook is only a guide.  (Docket No. 50 at pp. 11-12.)
Generally, if the patient alleges trauma to the eye, then the
doctor can perform a physical examination of the eye and check the
back of the eye, the pupil, the anterior chambers, and determine
whether there is a foreign object present in the eye.  Id. at
pp. 9-10.  The doctor might also perform an eye exam, then decide
on the treatment, if any.  Id. at p. 10.  The doctor may do a
flourescein stain if there is a suspicion that the cornea is
ulcerated.  Id.  If the patient complains of blurriness or loss of
vision, then a visual acuity test might be performed to corroborate
whether a loss of vision actually exists.  Id. at pp. 13-14.  If a
patient does not make that type of complaint, then the physician
has discretion not to perform a visual acuity test unless he
believes that it is necessary.  Id. at p. 14.  If a foreign object
is inside the eye cavity, and not in the cornea or another outer
part of the eye, then an x-ray of the patient's eye must be done.
Id. at pp. 20-21.  This procedure, however, must be performed by an
ophthalmologist.  Id. at p. 21.

        Usually, for ocular emergencies, the hospital's emergency
room has a flourescein stain, a visual chart, and an
ophthalmoscope.  Id. at p. 16.  The emergency room does not contain
a slit lamp, which is a piece of equipment that has an augmentation
lens and allows the viewer to see the cornea.  Id.  Castañer

Hospital is a primary hospital, not a tertiary hospital, and primary hospitals are not required to have a slit lamp because it is equipment that is used by an ophthalmologist and one needs to have training to use it. Id. at pp. 16 & 24. Medical centers have slit lamps but even hospitals like Auxilio Mutuo do not have them either. Id. at p. 24. Auxilio Mutuo has ophthalmologists with offices in the hospital so patients can be sent to those offices. Id.

         Once a month, an ophthalmologist named Dr. Raul Perez provides services at Castañer Hospital's emergency room and he will bring a slit lamp with him. Id. at p. 16. Generally, however, the emergency room does not contain a slit lamp. Id. Furthermore, Dr. Perez is not on call at any given time with the hospital. Id. at p. 24. Instead, he works at an external clinic at the hospital. Id.

         Dr. Rodriguez also detailed the procedure that an emergency physician would take if there is a foreign body inside the eye. Id. at p. 17. If the object cannot be seen and there is no complaint of loss of vision, then the doctor would wait and evaluate him the next day. Id. at p. 18. If it can be seen, the emergency room physician would either try to remove it or send the patient to the ophthalmologist. Id. To remove the object, the doctor would not use a slit lamp because there is no slit lamp at the hospital. Id. at p. 17. Instead, the physician would

anesthetize the eye and try to remove the object with a swab or needle.  Id.  If the physician cannot remove it, then he will patch up the eye, give antibiotics to the patient and send the patient home.  Id. at p. 17.  The physician may decide to reevaluate the patient twenty-four hours later or send him to an ophthalmologist, who can remove the foreign body with a slit lamp.  Id.

        Similarly, Dr. Rodriguez indicated that if the doctor suspects that there is a foreign object in the eye but is not sure, then the doctor may wait twenty-four to forty-eight hours.  Id.  Or, the doctor can advise the patient that if the patient's condition does not improve, he can return to or visit the Medical Center for treatment.  Id.  If there is no emergency and the patient can wait, then the doctor would send a patient to his or her primary physician because the patient would need a referral from his primary physician to see an ophthalmologist without incurring extra charges.  Id. at p. 19.

        Dr. Rodriguez indicated that during the week or regular working hours, ophthalmologists can been seen at their private offices.  Id. at p. 17.  During a weekend or outside of regular working hours, the only place that has an ophthalmologist on staff is the Medical Center.  Id.  Dr. Rodriguez stated, however, that medical centers only accept patients if they have an acute emergency, which include  perforation, bleeding, nails or metal in the eye, or anything else that might place the eye at risk.  Id. at

pp. 17-19.    Otherwise, a patient must wait to see an
ophthalmologist during regular working hours.  <u>Id.</u> at p. 18.

### j.    Expert Witness for Plaintiff - Dr. Miranda-Aponte

Dr. Edwin Miranda-Aponte ("Dr. Miranda") provided expert
testimony for the plaintiff as an emergency physician.  (Docket
No. 49 at pp. 8-41.)  Dr. Miranda is a physician duly licensed to
practice medicine in the Commonwealth of Puerto Rico.  <u>Id.</u> at p. 8.
He attended medical school in Spain, and he graduated and obtained
his license in 1981.  <u>Id.</u>  He is not board certified but he
received a specialty certification to practice emergency medicine
in 1991.  <u>Id.</u> at pp. 8-9.  The specialty in emergency medicine was
created in 1967 and allows doctors to evaluate patients of all ages
and all conditions on an emergency basis.  <u>Id.</u> at p. 10.

He can also perform minor surgery, such as
thoracocentesis, which is the placing of a chest tube inside of a
chest cavity.  <u>Id.</u>  He is a member of the Pan American Trauma
Society at the Puerto Rico Medical Surgeons College, <u>Id.</u>, and a
member of the Puerto Rico Medical Association.  He has teaching
experience at the Carolina University Hospital from 1983 to
approximately 1994, where he taught and supervised medical students
in the field of emergency medicine.  <u>Id.</u> at pp. 10-11.  He has also
evaluated and treated patients for a variety of emergency
situations.  <u>Id.</u> at pp. 11-12.

Currently, Dr. Miranda is a physician at the Puerto Rico Medical Services Administration in the Puerto Rico Medical Center. Id. at 12.  He is the director of all the medical services there, including emergency services.  Id.  He supervises all of the departments, which includes the emergency department.  Id.  He was the medical director of that particular emergency department for nine years and currently supervises the operation of the department as a whole.  Id.

Dr. Miranda has been qualified as an expert in approximately 160 federal and state court cases in Puerto Rico. Id. at pp. 11-12.  For this case, he was retained to review Cruz's medical records from Castañer Hospital and from Dr. Ortiz's ophthalmology practice.  Id. at 13.  He did not review Dr. Torres' or any other medical documents and did not interview Cruz.  Id. at pp. 32-33 and 36.  He did not know whether Cruz had a medical record already open at Castañer Hospital.  Id. at 33.  Dr. Miranda issued a report with bibliographic references regarding the care and treatment of Cruz by Castañer Hospital.  Id. at pp. 11 and 29. He was compensated for the time that he spent reviewing the records and issuing the expert report.  Id. at p. 11.  He indicated that his expert testimony is based on the usual practice of medicine and the standards of care strictly related to emergency medicine.  Id. at p. 13.

Here, Dr. Miranda believed that the chief complaint was pain, trauma, or injury to the eye.  Id. at p. 38.  His opinion was that Dr. Toledo did not follow the prescribed clinical evaluative process for the practice of emergency medicine:  he did not obtain a complete medical history from Cruz and did not perform a complete physical examination to get the diagnosis that there was a foreign body that caused the trauma.  Id. at p. 31.  Furthermore, Dr. Miranda stated that Dr. Toledo had available resources and options to transfer the patient to a receiving hospital to identify the foreign body fully, but did not do so.  Id. at p. 32. Dr. Miranda noted that while it is not the duty of the emergency physician to remove a foreign body after it is identified, Dr. Toledo should have consulted with an ophthalmologist to identify the foreign body and to document what he found fully.  Id. While intraocular foreign bodies can be difficult to diagnose, the symptoms and signs sometimes support a possibility of a foreign body.  Id. at p. 37.  So, the physician should do his best to identify or at least to confirm or rule out the suspicion.  Id. at pp. 36-37.

Dr. Miranda stated that each person who comes to an emergency department should have their complete medical history addressed and documented in his or her record.  Id. at p. 15.  This includes the past medical history, social history, family history, and the history of the present illness, meaning how the accident

occurred and what are the circumstances surrounding the situation.
Id.  Specifically, with regard to Cruz's accident, Dr. Miranda
stated that the patient should have been asked how the accident
occurred, if he had pain, sudden loss of vision, or double vision.
Id.  Next, a complete medical examination should have been done.
Id.  In regards to examining the eye, Dr. Miranda stated that an
emergency physician should have started with a visual acuity test,
then he should have evaluated the orbit, and the external ocular
movements of the muscle.  Id. at pp. 15 & 18.  Every structure of
the eye should have been evaluated, assessed, and documented.  Id.
at pp. 15-16.

        The emergency doctor should have also identified anything
that he could see with the naked eye, including foreign bodies,
blood, or anything inside the eye.  Id. at p. 16.  Dr. Miranda
stated, however, that none of this occurred.  Id. at pp. 16 & 19.
The only thing that Dr. Miranda remembers being documented was
redness in the conjunctiva or the white part of the eye.  (Docket
No. 49 at p. 18; Docket No. 51 at pp. 9 & 24.)  Also, antibiotics
are usually prescribed to prevent an infection in the affected eye
but no antibiotics were prescribed to Cruz.  Id. at pp. 24-25.  The
emergency doctor only prescribed analgesics and steroids for the
bee stings on the body.  Id. at p. 26.  Finally, the discharge
instructions should be clear, straightforward, and understandable
to any patient.  Id. at p. 27.  The instructions, Dr. Miranda said,

were to return to the emergency department or the primary care
physician if he were to have a relapse or any complication.   Id.
Dr. Miranda did not think that the instructions were clear and did
not indicate what complications could arise.   Id.

        Dr. Miranda also stated that the bee sting caused the
trauma and bees leave their stingers in the place of the injury so
there should have been a suspicion of a foreign body embedded in
the eye or the surrounding tissues.   Id. at pp. 16 and 36-37.
Therefore, the possibility of a foreign body embedded in the cornea
was very high and the physician should be alert to identify any
foreign bodies and the injuries associated with it.   Id. at pp. 16-
17.   Dr. Miranda, however, stated that the emergency physician who
saw Cruz was not aware of a foreign body inside his eye.   Id.   He
admitted that it might have been difficult for the emergency room
doctor to determine whether a foreign body was in the eye because
the affected eye was probably quite swollen.   Id. at p. 17.   But,
he also indicated that the suspicion in this case should have been
very high, and the physician should have made use of X-rays,
magnetic resonance, ultrasound, or a CT scan.   Id. at p. 17.

        Dr. Miranda acknowledged that if a foreign body is
inserted very deep into the cornea, a CT scan might not have picked
up the object.   Id. at p. 34.   He also admitted that aside from
plain X-rays, he does not know if any of these mechanisms are
available at Castañer Hospital.   Id. at p. 19.   Dr. Miranda noted

that if none of these mechanisms were available, the physician should have recommended that those tests be done elsewhere within a relatively short period of time. Id. at p. 19.

Dr. Miranda said that in this case, it was important to evaluate the integrity of the cornea by identifying simple lacerations, abrasions, or damage to the tissue. Id. at 20-21. Doctors usually do this by using a flourescein stain and a slit lamp. Id. at 20. He stated that physicians need to be trained to use a slit lamp and if one is available for use on the facilities, then the emergency physicians should have been trained to use one. Id. at p. 33. If a slit lamp was not available, then a similar procedure could have been done with the stain and an ophthalmoscope. Id. at pp. 20-21 & 40. The stain and the slit lamp or ophthalmoscope help physicians identify certain injuries that are not visible to the naked eye. Id. at pp. 20-21. This procedure was not done but Dr. Miranda does not know if the hospital had the proper equipment necessary for this type of examination. Id. at p. 22.

Most hospitals, he noted, have an ophthalmoscope and flourescein stain. Id. at p. 23. Dr. Miranda stated that even if none of these tools was available at the hospital, then the physician should have transferred the patient to a hospital that had the resources or specialists to examine the cornea. Id. at p. 23. Particularly, Dr. Miranda indicated that the doctor should

have transferred the patient to a place with slit lamps and an
ophthalmologist on staff. Id. at p. 23. The usual standard of
care includes consulting an ophthalmologist for the removal of a
foreign body. Id. at p. 23. Dr. Miranda stated that the emergency
doctor did not consult an ophthalmologist and did not advise the
patient to see a specialist in ophthalmology; he only advised the
patient to see his primary care physician on the next working day.
Id. at 23-24.

### k.   Expert Witness for Defendant - Dr. Emilio Arce-Lopez

The defendant contacted Dr. Emilio Arce-Lopez
("Dr. Arce") to perform a medical evaluation of several records.
(Docket No. 51 at p. 26.) He is an expert in the field of
ophthalmology. (Docket No. 51 at p. 29.) Dr. Miranda, the
plaintiff's expert, indicated that Dr. Arce's expert report was
written from the point of view of a specialist in ophthalmology.
(Docket No. 49 at p. 28.) Dr. Miranda noted, however, that there
were no bibliographic references in Dr. Arce's report. Id.

Dr. Arce has a bachelor's degree in biology from
Princeton University and a medical degree from the Ponce School of
Medicine. (Docket No. 51 at p. 26.) He was an ophthalmology
resident at the Puerto Rico Medical Sciences Campus. Id. at p. 26.
He has a license issued by the medical examination board which
authorizes him to practice medicine with a specialty in
ophthalmology. Id. Dr. Arce is not, however, board certified.

Id.  He has teaching experience and has been a professor for the
ophthalmology residency program at the Puerto Rico Medical Sciences
Campus.  Id.  He was also a professor in ophthalmology at the
Universidad Central del Caribe Hospital in Bayamon.  Id. at p. 27.
Dr. Arce has been an ophthalmologist since 1992 and is a
comprehensive ophthalmologist with a subspecialty in trauma and
refractive surgery.  Id. at p. 47.  He was also the former
president of the Puerto Rico Opthalmological Society.  Id. at
p. 47.  He has served as a medical expert in several cases but this
is the first time that he has come to court to testify.  Id. at
pp. 27-28.  Dr. Arce is also the Director of the Department of
Ophthalmology for the State Insurance Fund.  Id. at p. 28.  For the
State Insurance Fund, he also must attend to emergency patients in
ophthalmology.  Id. at p. 28.  He is on call every other week for
the State Insurance Fund in relation to emergency medicine and
attends to mostly trauma cases, which include many eye injuries.
Id.

        Dr. Arce reviewed all the medical records that were
offered to him, including the complaint, Dr. Toledo's deposition,
and relevant literature.  Id. at p. 31.  After he reviewed all of
these materials, he wrote a report, which was admitted into
evidence.  Id. at pp. 31 & 51-52; Defendant's Exh. D.)  After
reviewing the medical records from Castañer Hospital, which include
Cruz's complaints that were written down by both the nurse and the

treating physician, Dr. Arce concluded that Dr. Toledo did not deviate from the standard of care.  (Docket No. 51 at pp. 29-30.) He noted that there were no complaints or discussions about loss of vision from Cruz.  Id.  He indicated that there might have been something in the medical records about a sting in the eyelid.  Id. Dr. Toledo's testimony does not change his opinion.  Id.  Dr. Arce indicated that Dr. Toledo's testimony emphasized how his observations were about the eye area in general.  Id.  Furthermore, Dr. Arce stated that the patient had complained of pain in the general eye area because he had been stung by many bees on many parts of his body.  Id.  He indicated that this also which explains why pain was the main complaint.  Id.

Dr. Arce stated that given Cruz's complaint and main condition of multiple bee stings around the body, his opinion is that Dr. Toledo provided adequate treatment by (1) giving Cruz medication for pain, and (2) diminishing the inflammatory process and allergic reaction that occur with a bee sting.  Id. at p. 32.

When asked what constitutes an "exhaustive examination of the eye," Dr. Arce stated that the answer depends on whether the examination occurs at his private office or at the emergency room. Id. at p. 32.  A patient who goes to his office will receive a comprehensive general eye exam, which will include a visual acuity exam, an examination of the eyelids and bones of the eye, and also an examination of the eye itself, such as the conjunctiva, the

sclera, and the cornea.  Id.  He will also use special instruments
to examine the interior chamber of the eye, which include the iris,
the lens, and the retina.  Id. at pp. 32-33.  He will also check
the eye pressure, motility, and any deviations in eyesight.  Id.
A patient who visits him in the emergency room or at the State
Insurance Fund, however, will receive an eye exam that is specific
to a complaint.  Id. at p. 33.  An emergency room doctor would not
perform a comprehensive examination of the eye unless he receives
a complaint that would require one.  Id.  For example, an emergency
room doctor would perform a comprehensive eye examination if the
patient spilled cement in his eye or he was polishing something and
a piece of metal ended up in his eye.  Id.

          Dr. Arce also explained that a "diagnostic set" is
something that medical students purchase.  Id. at pp. 33-34.  The
set contains an opthalmoscope, an otoscope, and a pen light.  Id.
at p. 34.  The pen light is a piece of metal with a bright light at
the end, which is used for illumination.  Id.  The otoscope is an
adaptation of that and is used to look inside the eye.  Id.  The
ophthalmoscope is an instrument that has magnifying power which
doctors use to examine the inside of the eye; the nerve and the
retina in particular.  Id.  If a doctor does not have a pen light,
then he or she would use the ophthalmoscope light to look at the
external part of the eye.  Id.

The diagnostic set does not include a slit lamp, which is a "special big machine" that ophthalmologists use in their offices. It has magnification power and has different types of illumination. Id.  It is called a slit lamp because the doctors can make different slits of light and angle them in different positions to enable them to look at various structures of the eye with magnification.  Id.  If there is suspicion of an abrasion or perforation or epithelial defect - when the most external layer of the cornea is scraped - of the cornea, then the doctor will use a flourescein stain with a cobalt blue filter to detect that.  Id. at pp. 57-59.  An epithelial defect, however, does not necessarily occur with every trauma.  Id. at pp. 58-59.

Dr. Arce indicated that a CT scan would be done in cases where the doctor knows that there was blunt trauma or suspects fracture or a metallic object in the eye.  Id. at p. 35.  There was no such history in this case so Dr. Arce believes that it was unnecessary to do a CT scan.  Id.  Furthermore, a CT scan would not have detected organic, vegetable, or plastic materials because these types of objects would not react to conventional x-rays or computerized tomography.  Id. at p. 37.  Dr. Arce noted that given the small size and type of the fragment found, he does not believe that any type of radiology would have assisted Dr. Toledo in finding the object.  Id. at pp. 35-37.

Dr. Arce stated that when he works at an emergency room, he only checks a patient's visual acuity if the patient complains of pain in the eye, decreased vision, or cloudy vision.  Id. at p. 38.  He also stated that if a patient is not complaining of these problems, he would still ask them about their eyes because he is an ophthalmologist.  Id.  Dr. Arce noted that in Cruz's case, the treating physician did not find any direct action that produced a loss of vision.  Id. at p. 39.  He indicated that a bee sting to the eye, particularly inside the cornea, is an extremely rare circumstance; it is so rare that it was hard for him to find articles in medical literature about it.  Id. at p. 39.  His research showed that ophthalmological findings on bee stings that produce corneal injury are unpredictable: inflammation can be completely mild without any complaints or they can be very severe. Id. at p. 55.

Dr. Arce also indicated that if a bee did sting Cruz in the eye, the stinger would produce a mechanical injury to the cornea, which would cause the cornea to lose its transparency and would produce a scar.  Id. at p. 40 & 54.  If that scar is in the central visual axis area, then it would produce a definite loss of vision; if it is in the periphery of the cornea, then there may be a scar but it will not diminish the patient's vision.  Id. at p. 40.  Furthermore, the stinger releases venom right away after the sting, which produces a series of chemical reactions.  Id.

Even if the stinger can be removed, the venom would stay within the cornea, which would cause an inflammation process that can be devastating. Id. at p. 40. Dr. Arce stated, however, that Dr. Toledo's prescription of an antihistamine and an anti-inflammatory would have helped treat the venom. Id. at p. 45. He noted that Dr. Ortiz, who was the ophthalmologist who saw Cruz for the first time on Christmas Eve, gave Cruz topical anti-inflammatories in addition to antibiotics because he suspected an infection. Id. at p. 46. Dr. Arce stated that he knows for sure that Dr. Ortiz could not have seen the foreign body with just a light and would have needed a slit lamp to examine Cruz's eye. Id. at p. 47.

The stinger itself, Dr. Arce noted, would not cause an infection. Id. at p. 56. The stinger may or may not bring along bacteria but there is bacteria within the eye and the skin. Id. Topical antibiotics are given to prevent secondary bacterial infections, and once the inflammatory process starts, it makes tissues more susceptible to a secondary infection. Id. There was no evidence in the literature, however, that the stinger itself would produce an infection. Id. at pp. 56-57. A doctor, Dr. Arce stated, should be vigilant and watch for infection and treat it if that occurs. Id. at p. 47.

In the literature that Dr. Arce reviewed, even in cases where that type of problem was identified and treated right away by

an ophthalmologist, the inflammation was only ameliorated but not evaded.  Id. at pp. 40-41.  Furthermore, he noted that a bee sting in the cornea might not produce pain or inflammation right away and the patient might not feel or complain of anything.  Id. at p. 42. Once the inflammatory process starts, the cornea becomes swollen and inflamed, and there is a decrease in vision.  Id.  Even if Dr. Toledo assumed that there was something inside the cornea, he should not have attempted to remove it because he did not have the adequate illumination or magnification.  Id.  Dr. Arce also stated that removal of the stinger right away would not avoid the inflammatory process because the process is created by the venom and any barbs that might remain even after removal of the stinger. Id.

        Dr. Arce stated that if Dr. Toledo had suspected that Cruz had a stinger in the eye, then Dr. Toledo should have referred him to the Puerto Rico Medical Center because it is the only place where an ophthalmologist would be on call during Saturdays and holidays.  Id. at pp. 43-44.  Dr. Arce said that this is especially true on December 22, 2007, when Cruz had his accident, because it is the most important holiday weekend on the island.  Id.  Dr. Arce stated that the Medical Center is in San Juan.  Id. at 43.  Cruz would have to get from the mountains, where he resided, to the Medical Center in San Juan, and then wait to be seen by a doctor. This process could take between ten to twelve hours.  Id.  This is

because after Cruz would arrive to the Medical Center, he would
have to go through triage, be evaluated and interviewed by a nurse,
then be interviewed by an emergency room physician or primary
physician, who would then refer him to an ophthalmologist.   Id.
Even if he would see an ophthalmologist, the ophthalmologist would
still have to decide whether to remove the stinger.   Id. at p. 44.
Dr. Arce doubts that the Medical Center's resident ophthalmologist
would have had the knowledge to remove the particular foreign body
in Cruz's eye.   Id.   In all of his years in ophthalmology, he has
never seen a case like this.   Id. at p. 45.

        Dr. Arce also reviewed Dr. Ortiz's and Dr. Torres's
records with regards to plaintiff Cruz.   Id. at pp. 47-48.   He
indicated that Dr. Torres found the presence of cataracts in both
eyes.   Id. at p. 48.   Given her characterization of the cataract,
which Dr. Torres described as a "cataract plus 5, nuclear
sclerosis," Dr. Arce believes that the cataract was a senile
cataract, meaning that it is age-related.   Id. at 49.   He noted
that a "nuclear sclerosis" diagnosis is specific to age-related
cataracts.   Id.   With regard to Cruz's claims of photophobia,
Dr. Arce indicated that a review of Dr. Ortiz's evaluations showed
that there was never a complaint of pain or of photophobia; Cruz
only complained of decreased vision to Dr. Ortiz.   Id. at p. 50.
The cataracts would probably diminish any photophobia because they
allow less light to enter the eye.   Id.

Dr. Arce agreed with Dr. Torres's finding that a combined procedure of a cataract surgery and a corneal transplant would be the only way that the condition of Cruz's right eye would improve. Id. at p. 50.  He also stated that age is not a defining reason to choose not to perform surgery.  Id. at p. 51.  He also indicated that graft failures are the major risk of corneal transplant surgery.  Id.  Those failures occur much less in older patients because their immune systems are "much quieter" than younger people, who have stronger immune systems and have a higher possibility of rejecting the grafts.  Id.

## III. Conclusions of Law

### A.    The Federal Tort Claims Act

Plaintiffs bring suit pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2671 et seq.  The FTCA provides compensation for negligent or wrongful acts by federal employees committed within their scope of employment.  See 28 U.S.C. §§ 1346(b), 2401(b), 2671-80.[5]  To determine whether the United

---

[5] Section 2679(b) of the FTCA provides in relevant part:

The remedy against the United States provided by sections 1346(b) and 2672 of title injury or loss of property, or personal injury or death, arising or resulting from the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment is exclusive of any other civil action or proceeding for money damages arising out of or relating to the same subject matter against the employee whose act or omission gave rise to the claim or against the estate of such employee.

States was negligent, the relevant body of law is the law of the place where the alleged negligence occurred.  Torres-Lazarini v. United States, 523 F.3d 69, 72 (1st Cir. 2008); see also Vega-Mena v. United States, 990 F.3d 684, 689 (1st Cir. 1993).  Therefore, because the alleged negligence occurred at Castañer Hospital in Puerto Rico, Puerto Rico's law of liability for medical malpractice provides the standard of liability for this FTCA action.  Id.

**B.   Medical Malpractice Liability in Puerto Rico**

Medical malpractice liability in Puerto Rico is negligence and fault-based.  Rodriguez-Diaz v. Seguros Triple-S, 636 F.3d 20, 23 (1st Cir. 2011) (internal citation omitted).  Indeed, Puerto Rico's general negligence statute, Article 1802 of the Civil Code, states that "a person who by an act or omission causes damage to another through fault or negligence shall be obliged to repair the damage done."  P.R. Laws Ann. tit. 31, §5141.  "Within this rubic, three elements coalesce to make up a *prima facie* case for medical malpractice (a species of professional negligence)."  Martinez-Serrano v. Quality Health Services of Puerto Rico, Inc., 568 F.3d 278, 285 (1st Cir. 2009).  Therefore, to prove medical malpractice in Puerto Rico, a plaintiff must establish:  "'(1) the duty owed (i.e., the minimum standard of professional knowledge and skill required in the relevant circumstances), (2) an act or omission transgressing that duty, and (3) a sufficient causal nexus between the breach and the claimed

harm.'"   Torres v. Lazarini, 523 F.3d 69, 72 (1st Cir. 2008) (citing Cortes-Irizarry v. Coporacion Insular de Seguros, 111 F.3d 184, 189 (1st Cir. 1997)).

The Court finds that plaintiffs have failed to establish that Dr. Toledo committed an act or omission transgressing the duty of care owed to plaintiff in plaintiff Cruz's particular circumstances.  Even if plaintiffs had established that Dr. Toledo committed an act or omission transgressing the required duty of care, the Court finds that plaintiffs failed to establish a sufficient causal nexus between the breach and the claimed harm.

### 1.   Duty

Healthcare providers in Puerto Rico must meet a "commonwealth-wide standard of care." Martinez-Serrano, 568 F.3d at 285 (citing Oliveros v. Abreu, 101 P.R. Dec. 209, 226-27, 1 P.R. Offic. Trans. 293, 313 (1973)).  Providers are presumed to have met a "reasonable degree of care." Del Valle-Rivera v. United States, 630 F. Supp. 750 (D.P.R. 1986) (citing Viuda de Lopez v. Puerto Rico, 4 P.R. Offic. Trans. 251 (1975)).  Plaintiffs must rebut this presumption and generally must use expert testimony to establish the "applicable standard of care . . . and to make a judgment on causation." Pages-Ramirez v. Ramirez-Gonzalez, 605 F.3d 109, 113 (1st Cir. 2010); see also Rojas-Ithier v. Sociedad Espanola de Auxilio Mutuo v. Beneficia, 394 F.3d 40, 43 (1st Cir. 2005) ("a plaintiff bent on establishing a breach of a physician's duty of

care ordinarily must adduce expert testimony to limn the minimum acceptable standard and confirm the defendant doctor's failure to meet it") (internal quotation marks and citation omitted).

Healthcare providers have a "duty to use the same degree of expertise as could reasonably be expected of a typically competent practitioner in the identical specialty under the same or similar circumstances, regardless of regional variations in the professional acumen or level of care." Martinez-Serrano, 568 F.3d at 285 (citing Rolon-Alvarado v. Mun'y. of San Juan, 1 F.3d 74, 77-78 (1st Cir. 1993)).  "Transgressions of this duty may include, among other things, failing to diagnose an otherwise diagnosable medical condition or providing a patient with no reasonable disclosure of available choices of diagnosis and treatment, and the risks inherent in each." Serrano-Cortes v. United States, 2011 WL 3204734 (D.P.R. May 13, 2011) (internal quotation marks and citation omitted).

Not every mistake, however, will constitute malpractice. Suarez Matos v. Ashford Presbyterian Community Hosp., 4 F.3d 47, 50 (1st Cir. 1993).  The Puerto Rico Supreme Court has held that "even an acknowledged error in medical judgment cannot support a malpractice claim so long as the mistake is reasonable." Rolon-Alvarado, 1 F.3d at 78 (citing Oliveros v. Abreu, 1 P.R. Offic. Trans. 293, 314 (1973)).  Thus, a plaintiff who alleges that a physician committed malpractice must establish that the

physician's fault "is more than a mere hindsight possibility." Id.
(quoting Del Valle Rivera, 630 F. Supp. at 756). "In sum, tort law
neither holds a doctor to a standard of perfection nor makes him an
insurer of his patient's well-being. Professional standards
require normative judgments, not merely proof that a better way to
treat a particular patient could have been devised." Rolon-
Alvardo, 1 F.3d at 78.

         After reviewing plaintiff Cruz's medical record and
testimony from plaintiffs' and defendants' witnesses, the Court
finds that plaintiffs have failed to establish that Dr. Toledo and
Castañer Hospital committed an act or omission transgressing the
duty of care owed to plaintiff Cruz. Plaintiff Cruz's witnesses
presented conflicting testimony as to what should have been the
proper standard of care. Cruz's expert witness in emergency
medicine, Dr. Miranda, concluded that (1) Cruz's chief complaint
was pain, trauma, or injury to the eye; (2) Dr. Toledo failed to
obtain a complete medical history from Cruz and to perform a
complete physical examination of Cruz's eye to diagnose that a
foreign body caused trauma to Cruz's eye; (3) Dr. Toledo failed to
use the available resources and options to transfer the patient to
a receiving hospital to identify the foreign body fully. (Docket
No. 49 at pp. 31, 32, & 38.) The United States's medical expert in
ophthalmology, however, concluded that Dr. Toledo did not deviate
from the standard of care. (Docket No. 51 at pp. 29-30.) Instead,

he concluded that (1) Cruz's main complaint was pain from bee stings in general; (2) Dr. Toledo provided adequate treatment by giving Cruz medication for pain and medication to diminish the inflammatory process created by the allergic reaction from the bee stings.   The testimony of plaintiff Cruz's other witness, Dr. Rodriguez, the medical director of Castañer Hospital, supports the United States's arguments and not those of Dr. Miranda.

### i.   Cruz's Chief Complaint

With regard to Cruz's chief complaint, the medical record reflects that in the "main complaint and nursing observations" section, Nurse Garcia wrote "bees in (sic) the entire body." (Joint Exh. 1.)   The doctor's notes indicated that he observed bee stings in the eye area, arm, and leg. Id. Therefore, an examination of the medical record reveals that the chief complaint was not, as Dr. Miranda indicates, trauma or injury to the eye.   Instead, the evidence and testimony shows that the chief complaint was bee stings all over the body, including the eye area. Furthermore, several of the doctors who testified, including the medical experts for both sides and plaintiff Cruz's ophthalmologist, indicate that they have never heard of a bee sting inside a person's eye. (Docket No. 49 at pp. 34, 37, & 151; Docket No. 51 at p. 39.) While there is a first time for everything, it is not unreasonable for Dr. Toledo to assume that Cruz was not stung inside his eye, especially because Cruz failed to complain of

vision problems at Castañer Hospital.  (Docket No. 50 at p. 44;
Docket No. 51 at p. 13.)

### ii.  A Complete Examination of Cruz's Eye

Next, Dr. Miranda concluded that Dr. Toledo
failed to complete a thorough examination of Cruz's eye, to include
a visual acuity exam and an evaluation of the internal and external
structures of the eye.  (Docket No. 49 at pp. 15 & 18.)  Another
one of plaintiff Cruz's witnesses, Dr. Rodriguez, the medical
director of Castañer Hospital and Cruz's friend and primary
physician, stated that a thorough eye examination occurs only if a
patient complains of blurriness or loss of vision.  (Docket No. 50
at pp. 13-14.)  Defendant's expert witness in ophthalmology,
Dr. Arce, also stated that when he works in an emergency room, he
only checks a patient's visual acuity if he or she complains of
vision problems.  (Docket No. 51 at p. 38.)  Cruz admitted,
however, that he was not experiencing any blurriness or loss of
vision; all he experienced was tearing in his eyes.  (Docket No. 50
at p. 44.)  Dr. Toledo also confirmed that Cruz could see and did
not complain of any loss of vision.  (Docket No. 51 at p. 13.)
Dr. Rodriguez affirmed that an emergency room physician has
discretion not to perform a visual acuity test unless a patient
complains of loss of vision.  (Docket No. 50 at p. 14.)  Therefore,
even if Dr. Toledo made a mistake by not conducting a complete
examination of Cruz's eye, it was reasonable for Dr. Toledo to

forgo that examination given that there was no complaint of vision problems.

### iii. The Use of All Available Resources

Dr. Miranda also concluded that Dr. Toledo failed to use the available resources available to him to diagnose Cruz's condition properly.  Specifically, Dr. Miranda indicated that the emergency room doctor should have identified anything that he could see with the naked eye, which include foreign bodies or blood, but Dr. Miranda alleged that this did not occur.  (Docket No. 49 at p. 16.)  Dr. Miranda admits, however, that it might have been difficult to determine whether a foreign body was in the eye because the affected eye was probably swollen.  Id. at p. 17. Dr. Miranda also admits that Dr. Toledo did examine Cruz's eye and found redness of the conjunctiva, or white part of the eye.  Id. at p. 16.  In fact, Dr. Toledo documented this observation in Cruz's medical record.  (Docket No. 51 at p. 24.)  Indeed, Dr. Toledo stated that he examined Cruz's eye with a pen light but did not see anything.  Id. at p. 9.  Dr. Miranda stated that an emergency room doctor should have used mechanisms such as a fluorescein stain, a slit lamp, x-rays, magnetic resonance, and CT scans.  Id. at p. 20. Plaintiff's other witness, Dr. Rodriguez, indicated that a fluorescein stain is generally applied only if there is suspicion that the cornea is ulcerated, which Dr. Toledo did not suspect based on his observations.  (Docket No. 50 at p. 10.)

Dr. Rodriguez indicated that the hospital does not have a slit lamp; a slit lamp is a specialized piece of equipment that is used by ophthalmologists in their offices. (Docket No. 50 at pp. 16 & 24.) Therefore, it was impossible for Dr. Toledo to examine Cruz's eye with a slit lamp. Additionally, Dr. Miranda admitted that aside from plain X-rays, he does not know if Castañer Hospital had the capabilities for an emergency room doctor to perform magnetic resonance or CT scans. (Docket No. 49 at p. 19.) And even plain X-rays or computerized tomography could not have shown the minuscule particle in Cruz's eye. (Docket No. 51 at p. 37.)

### iv.  Transferring Cruz to Another Hospital

Finally, Dr. Miranda concluded that Dr. Toledo should have transferred Cruz to a hospital that had a slit lamp or an ophthalmologist to examine Cruz's eye. (Docket No. 49 at p. 23.) Given that Cruz did not complain of vision problems and Dr. Toledo did not make any findings about eye trauma using the available tools, it is reasonable for Dr. Toledo not to have referred Cruz to a medical center with an ophthalmologist. Furthermore, Dr. Toledo's actions were in line with Castañer Hospital's policy in such situations. Dr. Rodriguez indicated that the emergency physician at Castañer Hospital would usually wait and evaluate a patient the following day if an object cannot be seen in a patient's eye and there is no complaint of loss of vision. (Docket No. 50 at p. 18.) The doctor can also advise a patient to

return to the hospital if his or her conditions do not improve.
Id. at 17-18.  Here, although Dr. Toledo told plaintiff to see his
primary care physician or to return to the emergency room if he was
having problems, Cruz did neither.

        After examining the testimony and evidence, the
Court finds that Dr. Toledo did not deviate from the standard of
care given Cruz's situation and Dr. Toledo's observations.  In an
abundance of caution, however, the Court will assume that
Dr. Toledo deviated from  the standard of care because there is
disagreement among the medical experts who testified about the
appropriate standard of care.  Therefore, the Court will examine
whether there is a causal nexus between Dr. Toledo's actions and
plaintiff Cruz's harm.

        **2.   Causation**

        Under Puerto Rico law, a plaintiff must prove by a
preponderance of the evidence that "the [medical provider's]
negligent conduct was the factor that 'most probably' caused harm
to the plaintiff."  Rivera v. Turabo Med. Ctr. P'ship., 415 F.3d
162 (1st Cir. 2005) (quoting Lama v. Borras, 16 F.3d 473, 478 (1st
Cir. 1994) (internal quotations and citation omitted).  Plaintiff
Cruz alleges that Dr. Toledo's failure to complete a thorough
examination of Cruz's eye, failing to use the available resources
to diagnose properly that a foreign object was in Cruz's eye, and
failing to transfer Cruz to a hospital with expanded capabilities

led to a breach in standard of care. (Docket No. 1 at ¶ 32-33.)
This failure to meet an acceptable standard of care, plaintiffs
argue, caused harm to Cruz in the form of an ulcer and infection in
his right eye, and ultimately, loss of vision in that eye. Id.
Plaintiff argues that this caused him to lose vision in his right
eye permanently.

Even if the Court assumes that Dr. Toledo deviated
from an appropriate standard of care, plaintiff Cruz has failed to
establish that Dr. Toledo's actions were more likely than not the
reason that plaintiff does not have vision in his right eye.
Instead, the Court finds that several other factors, including
plaintiff Cruz's decision not to get corneal or cataract surgery,
were more likely than not the reasons, or contributed to, why Cruz
permanently lost vision in his right eye.

### i.   The Possibility of Proper Diagnosis

First, Dr. Toledo might not have been able
properly to diagnose that a foreign object was in Cruz's eyes even
if he performed a complete eye examination and used all resources
available.  Plaintiff's expert witness in emergency medicine,
Dr. Miranda, acknowledged that it would have been difficult for
Dr. Toledo to determine whether a foreign body was in the eye
because the affected eye was probably swollen. (Docket No. 49 at
p. 17.)  Furthermore, even if Dr. Toledo performed X-rays and
performed CT scans, the foreign object that was in Cruz's eye may

not appear, especially if the object was organic, vegetable matter, or plastic. (Docket No. 51 at p. 37.) Given that Cruz believes that the foreign object was a bee stinger, which is organic matter, the object would not have surfaced in an X-ray, CT scan, or any other type of imaging. Id. at pp. 35-37. Thus, Dr. Toledo - or any other emergency doctor - would not have been able to discover the matter through these types of mechanisms.

Similarly, Dr. Toledo might not have been able to diagnose that a foreign object caused trauma to Cruz's eye because no symptoms had appeared yet. Dr. Arce, the defendant's expert witness, stated that a bee sting to the cornea might not produce pain or inflammation right away. (Docket No. 51 at pp. 41-42.) He explained that the cornea is an avascular tissue, meaning that it does not have blood flow and most of the reactions that produce inflammation occur within the blood. Id. Therefore, plaintiff Cruz may not have felt any pain or experienced any decrease in vision immediately after the accident; he might not have been exhibiting symptoms of any problems. Id. at p. 42. Plaintiff Cruz and his expert witness offered no statements to counter that testimony. In fact, Cruz's statement that he had no vision problems and could see when he visited Castañer Hospital supports Dr. Arce's opinion. (Docket No. 50 at p. 44.) Thus, it was likely that the emergency room doctor could not discern that

there were problems inside the eye if the inflammation process had
not even begun in Cruz's eye.

### ii.   Immediate and Irreversible Injury

Next, even though Cruz may not have experienced
any symptoms, the witnesses testifying for both the plaintiffs and
defendants agree that that type of injury could still produce
immediate and irreversible damage to Cruz's cornea.  Specifically,
Dr. Ortiz, Cruz's ophthalmologist, acknowledged that the injury
could have immediate damage to the cornea.   (Docket No. 49 at
p. 130, 134, & 148.)  Dr. Arce, defendant's expert witness, also
stated that depending on where the stinger entered the cornea, a
scar may form and produce a definite loss of vision no matter how
quickly the trauma is properly diagnosed.   (Docket No. 51 at
p. 40.)  Dr. Arce also elaborated that the events leading up to the
loss of vision may sometimes be ameliorated but the final
consequence of losing vision may not be evaded.   Id. at p. 41.
Plaintiff Cruz presented no other testimony to rebut these
statements.

### iii. Cruz's Lack of Action

Furthermore, even if the injury did not produce
immediate and irreversible damage to Cruz's cornea, Cruz's own
actions - or more specifically, lack of action - could have
contributed to the loss of vision in his eye.  Cruz did not follow
Dr. Toledo's instructions and did not follow the recommendations

from Dr. Ortiz or Dr. Torres.  He also waited a long period of time
between several doctors' visits and developed a cataract, which
could have contributed to his vision problems.

          Dr. Toledo instructed Cruz to see a primary
care physician if he were to have a relapse or any complication.
(Docket No. 49 at 24 & 26; Joint Exh. 1.)  After Cruz and his
daughter discovered that his eye was turning blue, he nevertheless
did not follow those instructions.  (Docket No. 50 at 48, 81, 93,
& 94.)  Cruz did, however, see an ophthalmologist, Dr. Ortiz, two
days after the accident.  After a few visits, Dr. Ortiz indicated
that Cruz's eye responded to antibiotics quickly and that during
Cruz's second visit, the eye was in much better condition.  (Docket
No. 49 at pp. 91, 93, & 149.)  Eventually, Dr. Ortiz performed
surgery on Cruz's eye and removed the foreign object.  (Docket
No. 49 at pp. 108 & 110; Docket No. 50 at p. 56.)  After the
surgery, Cruz's vision improved and his vision remained better
until at least March 7, 2008.  (Docket No. 49 at pp. 112 & 118.)
On that date, Dr. Ortiz recommended that Cruz see Dr. Torres, the
cornea specialist.  (Docket No. 49 at pp. 45 & 116; Docket No. 50
at p. 59.)  There is no indication that Cruz saw Dr. Torres until
June 23, 2008, which was three months after Dr. Ortiz recommended
that Cruz make an appointment with her.  (Docket No. 49 at p. 45.)

          During that first visit on June 23, 2008,
Dr. Torres found that Cruz had an injury and a cataract but she

Civil No. 10-1753 (FAB)                                                      66

could not tell if the injury caused the cataract or whether the
cataract occurred before the trauma.  Id. at p. 49 & 55.  Dr. Ortiz
also indicated in his testimony that Cruz's age could be another
reason why a cataract developed.   Id. at p. 122.   Dr. Torres
recommended that Cruz undergo surgery because it was the only way
that he could improve his vision.  (Docket No. 49 at p. 53; Docket
No. 50 at p. 63.)  He did not follow this recommendation.  (Docket
No. 49 at p. 27.)   Cruz also did not see either Dr. Ortiz or
Dr. Torres again until one year later, on September 14, 2009.  On
that date, he had an appointment with Dr. Ortiz, who told him to
return within two months, but Cruz did not see Dr. Ortiz until four
months later, on January 14, 2010.  Id. at pp. 122 & 144.  On
September 14, 2009, Dr. Ortiz again recommended that Cruz undergo
surgery.  Id. at pp. 122-24.  Dr. Ortiz also recommended that Cruz
go back to see Dr. Torres and sent him back with a note saying that
Cruz wanted to have the proper surgery.  (Docket No. 49 at p. 62;
Docket No. 50 at p. 62.)

          On February 10, 2010, Dr. Torres and Cruz again
discussed the possibility of surgery.  (Docket No. 49 at p. 64.)
They scheduled an appointment for March 18, 2010, when Dr. Torres
would have examined his lab work and performed all the pre-surgery
tests.  Id. at pp. 73 & 76.  Cruz, however, did not show up, did
not call to cancel, and did not give a reason why he did not show
up.  Id.  Dr. Torres stated that the passage of time could have

Civil No. 10-1753 (FAB)                                              67

contributed to an increased loss of vision because the cornea's condition could have worsened with time. Id. at p. 78.

        Therefore, even if the Court assumes that Dr. Toledo deviated from an appropriate standard of care, plaintiff Cruz fails to establish that Dr. Toledo's actions were probably the reason that plaintiff does not have vision in his right eye. Instead, the Court finds that several other factors, including Cruz's decision not to undergo surgery, were more likely than not the reason, or contributed to the reason, that plaintiff Cruz permanently lost vision in his right eye.

**CONCLUSION**

For these reasons, the Court finds that Dr. Toledo and Castañer Hospital did not commit medical malpractice. Plaintiffs' claims are **DISMISSED WITH PREJUDICE.**

Judgment shall be entered accordingly.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, September 25, 2012.

                        s/ Francisco A. Besosa
                        FRANCISCO A. BESOSA
                        United States District Judge